**Electronically Filed
Supreme Court
SCWC-16-0000115
18-JUN-2020
12:23 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI,
Respondent/Plaintiff-Appellee,

vs.

MUSTAFA BAKER,
Petitioner/Defendant-Appellant.

SCWC-16-0000115

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000115; CR. NO. 13-1-0078)

JUNE 18, 2020

McKENNA, POLLACK, AND WILSON, JJ., WITH RECKTENWALD, C.J.,
CONCURRING AND DISSENTING, AND WITH NAKAYAMA, J., DISSENTING

OPINION OF THE COURT BY POLLACK, J.

In this case, we are called upon to determine whether one of our most critical procedural safeguards, the constitutional right against compelled self-incrimination, was upheld. The appeal involves the admission at trial of a confession, given by the defendant during the course of a

custodial interrogation.  Because we find that the tactics used by the interrogating police officer were so coercive that they rendered the defendant's statement involuntary, we hold that it should not have been admitted against him at trial.

## I.  BACKGROUND AND CIRCUIT COURT PROCEEDINGS

Mustafa Baker was arrested on January 8, 2013, based upon allegations that on December 31, 2012, he committed assault in the first degree in violation of Hawai'i Revised Statutes (HRS) § 707-710.[1]  Baker was subsequently indicted in the Circuit Court of the First Circuit (circuit court) on two counts of sexual assault in the first degree in violation of HRS § 707-730(1)(a)[2] and one count of sexual assault in the third degree pursuant to HRS § 707-732(1)(f).[3]

### A. Motion to Determine Voluntariness

The State filed a Motion to Determine Voluntariness of Defendant's Statement to Law Enforcement (motion to determine

---

[1]     HRS § 707-710 (1993) provides in relevant part as follows: "(1) A person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person."

[2]     HRS § 707-730 (Supp. 2009) provides in relevant part as follows:

(1) A person commits the offense of sexual assault in the first degree if:

(a) The person knowingly subjects another person to an act of sexual penetration by strong compulsion[.]

[3]     The circuit court dismissed the third degree sexual assault charge on the morning of the first day of trial because the charging language was deficient.

voluntariness) in accordance with HRS § 621-26.[4] In its motion, the State argued that a statement Baker gave to Honolulu Police Department (HPD) Detective (Det.) Brian Tokita during the course of a custodial interrogation on January 8, 2013, was voluntarily given and should be freely admissible at trial. A hearing on the motion was held at which Det. Tokita testified about the circumstances of Baker's custodial interrogation, which occurred on the day Baker was arrested.[5] Det. Tokita testified that before commencing the interrogation he read a standardized form to Baker that informed him of his constitutional rights. Baker said that he understood his rights, Det. Tokita stated, and then signed the form indicating that he waived his rights. Det. Tokita testified that the HPD was in possession of an audio recording and a written transcript of the interrogation, which were introduced into evidence. The court took the State's motion under advisement pending its review of the audio recording and transcript.

The audio recording of the interrogation discloses that the interrogation proceeded as follows. Det. Tokita began the interrogation by asking Baker several introductory

---

[4] HRS § 621-26 (1993) provides as follows: "No confession shall be received in evidence unless it is first made to appear to the judge before whom the case is being tried that the confession was in fact voluntarily made."

[5] The Honorable Karen S. S. Ahn presided over the motion and trial proceedings.

questions, such as his date of birth, level of educational attainment, age, and place of employment. Baker stated that he was 23 years old and was currently employed at a bakery, but he had only completed the eighth grade. Baker did not know his home address, but he indicated that he was living in Waimanalo and knew the name of the street on which he lived.

Det. Tokita then informed Baker that he had "been working on this case from the time it started," that Baker "clearly" did not "know what [Tokita] kn[e]w about this case," and that Baker should "trust [him]" when he tells Baker that he "know[s] a lot about what happened." Det. Tokita informed Baker that he knew Baker met the complaining witness (CW) on New Year's Eve in the Kailua District Park. The detective next told Baker "now here's your chance, tell me what happen[ed] from there in detail." Baker responded that he was drinking liquor in the park with his sister KK[6] and the CW, and GK arrived there and "did something" with the CW.[7] Baker explained that "[GK] told [him] he had sex with her, that's all. That's all I know . . . I was not involved in this at all." This had occurred, Baker said, when he went with his friends LKG and JKG to get

---

[6]     All minors referenced in this opinion are referred to by abbreviation.

[7]     Throughout the trial and Baker's interrogation, GK and KK were frequently referred to as Baker's siblings due to their close relationship, but he is actually their cousin.

cigarettes.  When he returned, "[GK]'s getting ready to fight with this boy.  This boy was that girl's boyfriend."

Det. Tokita interrupted and told Baker "Okay, no, I know that's not true. . . .  I know that didn't happen.  Like I said I've been investigating this case for a long time. . . . And I know what happened. . . .  I'm just giving you a chance to see if you going tell me what happened." Baker then admitted that he was trying to protect GK, and explained that GK was bloody when he arrived back at the park. Det. Tokita interrupted Baker again, stating "I know that's . . . not how it went."  Baker responded that he would not have sexually assaulted someone because he was "raped as a kid."

Det. Tokita expressed that Baker was a "straight up guy" because, while Baker had a record as a juvenile, he did not have a record as an adult.  Continuing with a friendly tone, Det. Tokita stated, "I don't know if you was doing any other drugs, but I know you was drinking.  I know you was smoking weed. . . .  Everyone gets blasted on New Year's Eve and that's where I think everything went wrong because you just made an error in judgment."  Without pausing, Det. Tokita then accused Baker and GK of beating the CW and further accused Baker of "put[ting] [his] penis in her vagina, and [GK] did after [Baker] and [Baker] came back and []did it again."  Baker responded "Woah" to this accusation.

Det. Tokita then offered another mitigating narrative to Baker, saying "I don't think you did it or meant to do it. You were just not in the right frame of mind. . . . That's where people go wrong, when they're in the wrong frame of mind. Then, Det. Tokita stated "Alcohol is . . . . where people get themselves into trouble, cause they lose their inhibitions[.]" The detective continued, "Women are a lot more promiscuous, you know. They flirt more, you know when they're on alcohol . . . cause they lose their inhibitions." After again discussing Baker's juvenile record, Det. Tokita assured Baker that, compared to other offenders, he was not a "bad dude." "I know. I just want to show that I not like that," Baker replied. "So I'm giving you a chance now, Mustafa. This is how you're going to be remembered," the detective said. Baker again denied committing a crime, repeating his assertion that he was "not like that." Returning to the mitigating narrative, Det. Tokita stated "Everybody fucks up in life, okay. . . . [O]ur brains are programmed a certain way, you know. . . . Guys are programmed to procreate." "Yeah," Baker responded. Det. Tokita continued, "Even movie stars right? We all get busted. This is how our brains are wired. You know what I mean? Now you put that brain on alcohol and drugs, now you're all fucked up and your thinking is all screwed up at that point." Before Baker

could respond, Det. Tokita warned, "So I know what happened. . . . [H]ow [do] you want to be remembered, dude?"

Continuing the interrogation, Det. Tokita changed tactics again, warning Baker about what it "sounds like on the outside." "The girl's a minor," Det. Tokita stated. "She's not an adult. . . . [I]f this hits the media, it would be . . . twenty-three year old boy rapes a fucking juvenile and how does that sound?" Baker answered "That's not me." and Det. Tokita replied, "Exactly. Cause when people hear that, what they going think that juvenile, [] how that juvenile is, you think?" Baker again said, "I'm not like that," prompting Det. Tokita to tell him, "I know you're not like that. I'm being straight with you cause you haven't had a record. . . . You just drank too much, dude. You drank too much. You smoked too much. Bad error in judgment. But it's time to come clean."

Det. Tokita then asked Baker, "When you go to court, you think people want to hear somebody that's going to fucking deny, deny when the evidence is like insurmountable against them, but they're just going to deny, deny to the bitter end." "No," Baker responded, and Det. Tokita continued, "they want to hear somebody that's you know what, . . . I made a mistake, . . . that's not me, but I made a fucking mistake, I did and I'm sorry. What do you think they want to hear?" Baker said that

people would want to hear the truth, and then Det. Tokita warned, "I don't want to be jerked around."

At this juncture Baker had not admitted to any criminal activity, and the detective changed course. Det. Tokita told Baker, "we g[o]t physical evidence, so you cannot deny that you didn't have sex with her. . . . We have physical evidence and nobody can deny physical evidence."

Baker repeated his statement that he did not beat the CW, which prompted Det. Tokita to respond, "Mustafa come on. Now you're jerking me around again." Baker again repeated that he did not beat the CW. Det. Tokita returned to the sexual assault allegation, telling Baker, "Did she want to fuck? No. . . . So why'd you fuck her then?" Then, for the first time, Baker admitted to having sex with the CW, explaining, "[c]ause I was all fucked up." "You wasn't thinking straight," Det. Tokita offered, to which Baker said, "We had four bottles of Jack Daniels. . . . I was smoking weed off the chain. I was all fucked up." After this Baker again denied beating the CW, stating that GK beat her with a bottle.

Det. Tokita then provided a sequence of events, accusing Baker of having sex with the CW against her will three times. The detective stated that first Baker had vaginal sex with the CW, then GK had vaginal sex with her, then Baker returned and had anal sex and vaginal sex with the CW. "That's

why I know there's physical evidence that you guys cannot deny because there's DNA in there and you know that DNA's one of [a] kind," Det. Tokita said. After Baker replied "Yeah," Det. Tokita stated, "Exactly, so I know what happened already, cause there's physical evidence."

Baker again stated that he "did not beat her up." This prompted Det. Tokita to ask, "so you admit you fucked her, penis in vagina?" Baker said "Yes." Det. Tokita followed this admission by trying to get Baker to adopt the detective's version of events. Baker, resisting Det. Tokita's narrative, responded, "I only went twice." Det. Tokita again recited his version of events to Baker, telling him "[R]emember you don't know what I know now?" He then warned Baker, "you're losing me when you bullshit me." Baker repeated his statement that he only had sex twice, to which Det. Tokita again pressed Baker to accept the detective's version of the events. Baker then appeared to adopt Det. Tokita's version, replying, "Okay."

To clarify Baker's possible admission, Det. Tokita asked "You tell me, am I right or am I wrong?" to which Baker answered, "I don't know." Det. Tokita responded, "what [do] you mean you don't know?" Baker explained that he had not had anal sex with the CW because "she was laying on her back the whole time." Det. Tokita again told Baker his version of the events and warned, "I have the physical proof Mustafa." Det. Tokita

then asked Baker whether he was "going to own up." Baker said "Yes. I ain't going to argue with you no more." Det. Tokita once again attempted to get Baker to confess to the version of events that the detective had set forth. Baker finally admitted to Det. Tokita's narrative. Det. Tokita demanded to know why Baker denied having sex with the CW in the manner that Det. Tokita described up until that point, to which Baker responded, "I was scared." Det. Tokita again warned Baker, "I told you already, I know what happened. . . . Once you stray from the real story, I know already." Det. Tokita then reassured Baker that he was not trying to manipulate him, he was simply seeking "the straight answers." Det. Tokita asked Baker, "look Mustafa, . . . have I steered you wrong?" "No," Baker responded. "I'm not playing games with you, right? What I'm telling you is straight up. I'm being straight up with you," the detective continued. Baker responded, "Right, right," to this, and Det. Tokita said, "And that's what I want you to be with me. You know what I mean? Fair is fair."

After this exchange, Baker told Det. Tokita, "I didn't beat her[,] all I did [was] grab[] her and thr[o]w her to the ground." Det. Tokita rejected this, telling Baker, "I know [GK] hit [the CW] with the bottle already, but I know the both of you beat her." Baker once more denied beating the CW, which prompted Det. Tokita to exclaim, "Dude." Baker attempted to

explain further, saying, "I tried to sit her here, she tried to get up. So I pushed her, she fell right on her face again[.]" Det. Tokita again rejected Baker's response, stating, "[Baker] the both of you beat her. I know the both of you beat her. I know that for a fact, dude." Baker denied, for the thirteenth time, beating the CW.

Det. Tokita then presented Baker with an assault narrative, explaining to him, "You told [GK], smash her head with the bottle, bash her on the head, okay? . . . I believe you, okay, but you start beating her." Baker attempted to explain that GK hit the CW in the face with the bottle, before saying, "I don't know why I did 'um." He said that afterwards he picked the CW up and helped her put her clothes back on. Apparently accepting this statement, Det. Tokita told Baker, "See that checks out . . . because you told me you have ADHD . . . [s]o maybe you got a little bit of that, . . . . [s]ometimes maybe you snap."[8] Baker agreed that he snaps, saying "I do. It's . . . it's normal." Continuing, Det. Tokita stated, "when you on alcohol and you're on drugs, chances of that happening would be worse . . . you're not yourself." Drawing connections between himself and Baker, Det. Tokita said,

---

[8] In the preliminary stages of the interrogation, Baker informed Det. Tokita that he took Ritalin for "ADHD" as a child, but that he stopped taking it over ten years prior to the interrogation because his father did not approve of the medication.

"I do some fucked up things when I drink, dude, let me tell you that."  He further attempted to draw parallels between Baker and himself, saying, "I do some fucked up things when I drink and that's part of the reason why, fuck, I'm divorced, you know what I mean?  Cause I did some fucked up things."  "Me, too."  Baker responded.  Baker then offered that he was divorced as well.

After this exchange, Baker once again denied beating the CW.  This appeared to frustrate Det. Tokita, who responded, "Dude, come on.  Now this is when I know you're not being straight with me.  You know what I mean and when I write my report, that's what it's going to reflect.  That you weren't being straight with me about that."  Baker asked, "What do you want to hear, officer?  What question do you want to ask?"  "I want to hear the truth from you," Det. Tokita stated. "Why did you hit her and why did you kick her like that?" Det. Tokita questioned.  "I was scared" Baker responded, and then stated that he didn't want to remember, and that he was still scared. Det. Tokita pressed Baker further, asking, "why did you beat her up?"  Finally, Baker offered, "I was drinking.  It was in the moment.  I was fucked off my ass."

Det. Tokita once more urged Baker to take responsibility for directing the attack on the CW, telling him, "[GK] didn't want to fuck her either.  He was scared. . . .  But you told him to [do] it.  Do you remember?"  Baker responded,

"No." Det. Tokita appeared unwilling to drop the point, stating, "Well that's what happened[.]" The detective tried once more, asking Baker what he would say to GK if he was present. Baker responded, "GK had nothing to do with it until I told him to." Det. Tokita responded "you told him to . . . hit her over the head, right, with the bottle? . . . To have sex with her." Baker did not respond to this suggestion. The interview concluded with Baker affirming that he was not coerced or forced to make his statement.

Following the hearing, the circuit court issued a minute order granting in part the State's motion to determine voluntariness and making several findings of fact and conclusions of law. The court found that Baker was administered his Miranda rights, and that he subsequently waived them when making his statement to the police. The court further found that, despite only completing the 8th grade, Baker displayed "no signs of any inability to understand questions or to respond appropriately to any given question."

Additionally, the circuit court found that Det. Tokita engaged in "apparently deceptive assertions" and "urged [the] defendant to tell the truth, sometimes using an insistent tone." The court found that these tactics implicated intrinsic facts and were not deliberate falsehoods extrinsic to the facts of the case and that Baker was able to deny certain allegations when he

wanted to.  Considering the totality of the circumstances, the court concluded that "the State ha[d] proven by a preponderance of the evidence that [the] defendant gave the bulk of his January 8, 2013, statement voluntarily, knowingly, and intelligently."  The court denied the State's motion in part, finding that the State had failed to prove that Baker's statement was voluntary as to the final portion of the interview in which "the detective sought to get the defendant to admit that he directed [GK] to hit and assault the complaining witness."

## B.  The Trial

At trial, the State called Det. Tokita to testify about his investigation and interrogation of Baker.  A redacted version of the audio recording of the interrogation was played for the jury.[9]  Regarding the interrogation, Det. Tokita testified that he told Baker during the interrogation that he had DNA evidence.  When asked "was that an accurate statement," Det. Tokita said, "Not at that time, no."  Det. Tokita

---

[9]     Prior to trial, the State produced a redacted transcript of the interrogation that it sought to have admitted.  The State had redacted Baker's statement, "I've been raped as a kid," contending that its inclusion would be unduly prejudicial pursuant to Hawai'i Rules of Evidence (HRE) Rule 403.  The circuit court admitted the redacted transcript over defense objection, reasoning that the statement should be redacted because it was too vague and could affect the jury's decision by arousing sympathy for Baker or, conversely, causing the jury to assume that Baker would be more likely to commit sexual assault as a victim of sexual assault.  The redacted transcript of the audio recording was provided to the jury while the recording was played for the jury.

acknowledged that he lied to Baker during the interrogation to "try[] to get the truth out of him."

LKG testified that she and her brother, JKG, were at the park on the afternoon of New Year's Eve where she saw Baker, GK, and the CW drinking and having fun. The CW smoked marijuana, LKG testified, and kissed Baker while sitting on his lap. LKG said she did not see Baker and the CW have sex. After the CW kissed Baker, LKG and JKG went to a different part of the park for approximately 30 minutes, LKG explained. LKG said that when they returned to the area where Baker, GK, and the CW had been, LKG found the CW sitting outside the bathroom by herself, covered in blood.

JKG also testified, stating that he did not see anyone doing drugs, but he did see other people drinking alcohol. JKG further testified that he did not see the CW talk to, kiss, or have sex with Baker.

The CW then gave her account of what transpired. She was with Baker and his cousin KK at the park, the CW explained, and they were all drinking and smoking marijuana. The CW denied ever flirting with, kissing, or asking Baker for sex. The CW testified that she fled into a bathroom after police officers approached the trio in the park. Baker came into the bathroom and propositioned her, the CW elaborated. The CW stated that she repeatedly told Baker no, but when she started to leave,

Baker and GK, who had entered the bathroom, began punching, hitting, and kicking her.  Someone hit her with a bottle, causing her to lose consciousness, the CW explained.  The CW testified that, when she awoke, Baker had his penis in her vagina.  GK then had vaginal sex with her to completion, after which Baker put his penis in her anus and then her vagina, the CW stated.  The CW testified that she never consented to sex with either Baker or GK.  When asked to describe her injuries, the CW explained that she was "bleeding from head to toe," had cuts on her face, a black eye, cuts on her eyelid and lips, and damage to her jaw that required surgery.

KK testified that she was with the CW on New Year's Eve, when the two of them went to Kailua "to go find drugs" and "people to go party with[.]"  She said that, before meeting up with Baker, they got acid, methamphetamine, marijuana, and alcohol.  The CW and KK consumed "[t]he acid, the methamphetamine, the alcohol, [and] the marijuana" together, KK testified.  KK did not see the CW kiss Baker or sit on his lap, but she did see them sit next to each other and "being pleasant with each other."[10]

The State also called Officer David Esaki, a criminalist with the HPD, who had analyzed DNA evidence

---

[10]     KK indicated that at the time she "couldn't see anything clearly" and "couldn't comprehend what was going on" due to the acid.

collected from the CW's breast, mouth, vagina, and anus.  Baker was conclusively ruled out as a contributor of the DNA from the CW's vagina and the results were inconclusive as to the rectal, chest, and mouth DNA, Officer Esaki testified.

Doctor (Dr.) Wayne Lee, a licensed physician and surgeon working at the Sex Abuse Treatment Center, testified on behalf of the State as an expert in the examination and treatment of sexual abuse patients.  Dr. Lee examined the CW on January 1, 2013, wherein he collected the DNA swabs and conducted a pelvic and anal examination.  The CW had redness, swelling, and multiple shallow lacerations on her external genitalia, and multiple acute, tender anal fissures all consistent with trauma.

GK, who was called as a witness for the defense, explained that he was at the park that afternoon with his brother Baker, LKG, and JKG.  He testified that, along with drinking with everyone present, he "did acid with [the CW]." The CW and Baker were kissing, GK explained, before the two went to the bathroom to have sex.  GK testified that he did not hear any yells, screams, or the sound of someone being hit while Baker and the CW were in the bathroom.  GK then propositioned the CW, who refused to have sex with him.  When the CW refused to have sex with him, he hit her with a bottle, started beating her, and then had sex with her, GK testified.  Baker did not hit

or beat the CW at all, GK testified, nor did he force himself on the CW. GK explained that he put his penis in the CW's anus and that Baker was not present.

GK also testified that in January of 2013 he gave a statement to Det. Tokita in which he said that it was Baker who told him to hit the CW with a bottle and beat and kick the CW. At trial, GK admitted that his statements to Det. Tokita were lies, which he told because he was scared and "thought that by doing that, [he] would get in less trouble." Further, because Baker had already had consensual sex with the CW, GK testified, he thought he could blame it on Baker.

The jury found Baker guilty as charged on both counts. In determining Baker's sentence, the circuit court noted that Baker had no record, was young, and had a family to support. Among other reasons cited by the court, it stated that it was greatly concerned by the fact that Baker did not appear to have told the truth during his interrogation and that Baker had "taken no responsibility at any time[.]" Considering these factors and others, the circuit court sentenced Baker to a twenty-year term of imprisonment in each count to be served consecutively.

Baker appealed from the Judgment of Conviction and Sentence (circuit court judgment) to the Intermediate Court of Appeals (ICA). On appeal, he contended that the circuit court

erred in finding that his statement to the police was voluntary and admissible. Baker also contended that his constitutional right to present a defense was violated and that the imposition of a consecutive sentence was an abuse of discretion and violation of his constitutional rights.

## II. ICA PROCEEDINGS

In its opinion affirming the circuit court judgment,[11] the ICA first addressed the voluntariness of Baker's statements to Det. Tokita.

The ICA evaluated Det. Tokita's tactics during the interrogation and concluded that they were not improperly coercive. Det. Tokita, the ICA explained, "refused to accept Baker's 'initial version[s] of events'" and "persistently urged Baker to 'come clean' and 'own up.'" (Alteration in original.) This conduct was permissible, the ICA held, because the detective "never made any threats or promises to Baker." The ICA was also not convinced that Det. Tokita "raised the threat of media publicity" during the interrogation because he "never threatened to publicize the details of the assault if Baker did not tell a particular story." Because Det. Tokita merely advised Baker that it would be better for him to tell the truth

___

[11] The ICA's opinion can be found at State v. Baker, 142 Hawai'i 466, 421 P.3d 674 (App. 2017).

rather than threatening Baker, the detective's conduct did not render Baker's statement involuntary, the ICA concluded.

The ICA also found that Det. Tokita repeatedly told Baker that he had physical evidence when no such evidence existed. These misrepresentations "were falsehoods intrinsic to the facts of the alleged offense," the ICA held, and therefore were not coercive per se. The ICA accordingly analyzed the totality of the circumstances surrounding Baker's interrogation in determining the voluntariness of his confession. The ICA concluded that Baker's confession was not involuntary because "Detective Tokita's questioning was not of a type that would reasonably induce a false confession."[12]

The ICA accordingly affirmed the circuit court's judgment.[13] Baker timely filed an application for writ of certiorari, which this court accepted.

## III. STANDARDS OF REVIEW

We have "applied a 'clearly erroneous' standard of review to the [findings of fact] made by the court in connection

---

[12] The ICA also considered whether Baker's mental and physical condition rendered his statement involuntary and concluded that it did not.

[13] Additionally, the ICA concluded that the circuit court did not abuse its discretion in redacting Baker's statement, "I've been raped as a kid," because the statement could have caused the jury to make an emotionally-based decision and because Baker was able to present a complete defense. The ICA further held that Baker's consecutive sentence was properly imposed under HRS § 706-606, was not cruel and unusual, and did not violate Baker's constitutional rights under Apprendi v. New Jersey, 530 U.S. 466 (2000).

with a voluntariness hearing" to determine whether to admit a confession into evidence at trial. State v. Hoey, 77 Hawai'i 17, 32, 881 P.2d 504, 519 (1994). This is based on the rationale that "[w]hether the defendant invoked his right to counsel and whether he waived the right are primarily questions of fact." Id. (alteration in original) (quoting State v. Villeza, 72 Haw. 327, 330-31, 817 P.2d 1054, 1056 (1991)).

This court has also recognized that "in a . . . technical sense, waiver is a question that requires application of constitutional principles to the facts as found." Villeza, 72 Haw. at 331, 817 P.2d at 1056 (internal quotation marks omitted). Accomplishing this task "requires us to examine the entire record and make an independent determination of the ultimate issue of voluntariness based upon that review and the totality of circumstances surrounding [the defendant's] statement." State v. Kelekolio, 74 Haw. 479, 502, 849 P.2d 58, 69 (1993) (alteration in original) (internal quotation marks omitted). Thus, we apply a de novo standard of appellate review to "the ultimate issue [of the] voluntariness" of a confession. Hoey, 77 Hawai'i at 32, 881 P.2d at 519 (alteration in original).

## IV. DISCUSSION

### A. Voluntariness of Confession – General Principles

Under the Fifth Amendment to the United States Constitution and article I, section 10 of the Hawai'i

21

Constitution, "no person shall be compelled in any criminal case to be a witness against himself or herself." State v. Kelekolio, 74 Haw. 479, 501, 849 P.2d 58, 69 (1993) (internal quotation marks and alterations omitted). Accordingly, "[t]he constitutional right against self-incrimination prevents the prosecution's use of a defendant's extrajudicial admissions of guilt where such admissions are the product of coercion." State v. Matsumoto, 145 Hawai'i 313, 324, 452 P.3d 310, 321 (2019) (quoting Kelekolio, 74 Haw. at 502, 849 P.2d at 69). The reasons for barring coerced confessions include "the inherent untrustworthiness of involuntary confessions, a desire that criminal proceedings be accusatorial rather than inquisitorial[,] and a desire that the police not become law breakers in the process of achieving society's valid law enforcement objectives." Id. (alteration in original).

In order for a statement to be voluntarily given, the decision to give the statement must have been a free and unconstrained choice. See State v. Yong Shik Won, 137 Hawai'i 330, 340, 372 P.3d 1065, 1075 (2015) ("Voluntariness means a 'free and unconstrained choice.'" (quoting State v. Shon, 47 Haw. 158, 166, 385 P.2d 830, 836 (1963))). A decision to give a statement is free and unconstrained if it is not coerced. Id. at 341, 372 P.3d at 1076. Generally, determining whether a defendant's confession during a custodial interrogation was

22

coerced requires case-by-case consideration of the totality of the circumstances surrounding the defendant's statement. Kelekolio, 74 Haw. at 502, 849 P.2d at 69 (citing, inter alia, Frazier v. Cupp, 394 U.S. 731, 739 (1969)). Crucially, a court must not analyze the individual circumstances in isolation, but must weigh those circumstances in their totality. Wilson v. Lawrence Cty., 260 F.3d 946, 953 (8th Cir. 2001) ("[A] totality of the circumstances analysis does not permit state officials to cherry-pick cases that address individual potentially coercive tactics, isolated one from the other, in order to insulate themselves when they have combined all of those tactics in an effort to overbear an accused's will.").

Under certain circumstances, however, we have held that the need for a "totality of circumstances" analysis is obviated by the inherently coercive nature of the improper interrogation techniques that were used in a custodial setting. Kelekolio, 74 Haw. at 511, 849 P.2d at 73. Specifically, this court has held that when the police employ a falsehood that is extrinsic to the facts of the alleged offense and is of a type reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt, any subsequent statement by the accused is automatically considered involuntary. Id. Thus, Hawai'i courts evaluate "the legitimacy of the use of 'deception' by the police in eliciting confessions

or inculpatory statements from suspects and arrestees"
differently depending on whether the deception involved
information intrinsic to the alleged offense or extrinsic to the
alleged offense.  Id.

Intrinsic falsehoods include, for example, a statement
that a murder victim is still alive, a claim that articles of
clothing were found at a crime scene, or an assertion that
cameras were recording the area of the crime.  Matsumoto, 145
Hawai'i at 324, 452 P.3d at 321.  Although intrinsic factual
deception is not considered so coercive as to automatically
render the accused's statement involuntary, it may still be
unduly coercive and its presence is a relevant circumstance that
should be considered as part of the "totality of circumstances."
Kelekolio, 74 Haw. at 513, 849 P.2d at 74 (finding that
confessions procured through intrinsic factual deception are
subject to a "totality of circumstances" analysis).  In
Kelekolio, this court found that if the police obtain a
confession through the use of intrinsic factual deception that
is of a type reasonably likely to procure an untrue statement,
then the statement will be determined to be involuntary.  See
id. (holding that the misrepresentations used by detectives
"were not of a type that would reasonably induce a false
confession" and therefore did not render the defendant's
inculpatory statements involuntary).

As stated, extrinsic falsehoods are falsehoods that incorporate considerations beyond the immediate facts of the alleged offense. Examples include assurances of divine salvation in the event of a confession, promises of mental health treatment instead of imprisonment, and misrepresentations of legal principles or the results of a polygraph test. Id. at 512, 849 P.2d at 73; Matsumoto, 145 Hawai'i at 327, 452 P.3d at 324. Like intrinsic falsehoods, extrinsic falsehoods are evaluated based on whether they are "reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt." Kelekolio, 74 Haw. at 512, 849 P.2d at 73. If the police officer's conduct meets the extrinsic falsehood test, it will be regarded as coercive per se, and the statement of the accused is automatically considered involuntary. Id. at 511, 849 P.2d at 73.

In cases when the police's use of extrinsic deception does not obviate the need for the inquiry, the totality of the circumstances surrounding an accused's statement to the police must be examined in order to determine whether the statement was the product of coercion or otherwise involuntary. Id. at 502, 849 P.2d at 69. Of the various circumstances that bear on voluntariness, the use of coercive interrogation tactics by the police is the most salient in determining whether the confession was the product of coercion. See id. at 503, 849 P.2d at 70 ("A

confession may be rendered involuntary by 'impermissible police conduct.'" (quoting State v. Amaya-Ruiz, 800 P.2d 1260, 1272 (Ariz. 1990)).

In Kelekolio, this court directly addressed the coercive effect of the interrogating officer's use of deception. Kelekolio, 74 Haw. at 505-13, 849 P.2d at 71-74. As discussed, we crafted a rule holding that deliberate intrinsic falsehoods would be evaluated under the totality of the circumstances, while deliberate extrinsic falsehoods that are of a type reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt would be considered coercive per se. Id. at 511, 849 P.2d at 73. While our rule specifically addressed falsehoods, our purpose was broader: to curtail the improper use of manipulative and deceptive tactics during custodial interrogations. See id. ("In our view, the relevant case law and scholarly authority . . . is amenable to the formulation of a rule by which to measure the legitimacy of the use of 'deception' by the police in eliciting confessions or inculpatory statements from suspects and arrestees.").

Deception can be "[t]he act of deliberately causing someone to believe that something is true when the actor knows it to be false." Deception, Black's Law Dictionary 510 (11th ed. 2019). But deception can also be "[a] trick intended to

26

make a person believe something untrue." Id. This court has never held that improperly coercive interrogation techniques must involve a deliberate misrepresentation to the accused. Indeed, in Kelekolio, we held that assurances of divine salvation upon confession are so manipulative and prone to producing coerced confessions that they are coercive per se--but we did not require that the assurances be shown to be a falsehood. 74 Haw. at 512, 848 P.2d at 73. For example, if the police induce a confession by promising that the accused will be released on bail if the defendant admits to the underlying conduct, such a promise would be impermissibly coercive even if the accused was released on bail after making the confession.

As such, we clarify that the relevant inquiry in determining whether deceptive interrogation tactics are improperly coercive is whether the deception is reasonably likely to procure an untrue statement or influence an accused to make an involuntary confession. Our law requires us to examine the entire record and make an independent determination of the voluntariness of Baker's custodial statement to the police. Kelekolio, 74 Haw. at 502, 849 P.2d at 69 (quoting State v. Villeza, 72 Haw. 327, 330-31, 817 P.2d 1054, 1056 (1991)). Accordingly, we examine Det. Tokita's conduct during the

interview to determine whether deceptive interrogation tactics were used.[14]

## 1. Baker's Confession Was Involuntary Under the Totality of the Circumstances.

### a. Detective Tokita's Interrogation Tactics

During the interrogation, Det. Tokita suggested what the public perception of Baker's conduct would be and the manner in which the media would report on his offenses.  Specifically, Det. Tokita asked Baker, "if this hits the media, it would be . . . twenty-three year old boy rapes a fucking juvenile and how does that sound?"  "That's not me." Baker said in response, and Det. Tokita replied, "Cause when people hear that, what they going think that juvenile, [] how that juvenile is, you think?"  Baker replied, "I'm not like that."

Comments during a custodial interrogation about how the public will perceive the conduct of the accused and what the media coverage will be like "if it hits" the news communicate to the accused that confessing may result in a better public perception.  Additionally, such comments convey that the alleged crime may receive less news coverage if the defendant confesses

---

[14]     Even though Baker contends that the entirety of his confession was not voluntarily made, Justice Nakayama's dissent notes that this opinion reviews the coerciveness of certain statements made during the interrogation that Baker did not specifically challenge.  Nakayama, J., Dissenting (Dissent) at 33-34.  However, it is well settled that an appellate court is required to review the entire record and make an independent determination of the voluntariness of a custodial statement.  Kelekolio, 74 Haw. at 502, 849 P.2d at 69.

because it may not "hit the media." Conversely, the parallel implication is that not confessing may result in a more negative portrayal of the accused in media coverage and that the extent of the coverage may be greater.[15]

Effectively, Det. Tokita's question was an implied promise that Baker would receive a benefit if he chose to confess and consequences if he did not. See State v. Rettenberger, 984 P.2d 1009, 1018 (Utah 1999) ("Promises of leniency necessarily imply the threat of harsher punishment."). A promise, even when merely implied, of more favorable treatment in the event a confession is made is an interrogation tactic that is reasonably likely to elicit an untrue statement or to influence an accused to make an involuntary confession. Kelekolio, 74 Haw. at 511-12, 849 P.2d at 73 (noting that promises of more favorable treatment in the event of a confession are reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt); see also Brady v. United States, 397 U.S. 742, 753 (1970) ("To be admissible, a confession must be free and voluntary: that is, [it] must not be . . . obtained by any

_____

[15] The ICA concluded that Det. Tokita's comments about public perception were not coercive because Det. Tokita did not explicitly threaten to personally publicize the details of Baker's case. The dissent reaches a similar conclusion. Dissent at 31. However, conveying to a defendant that confessing may result in a better public perception of the defendant in the media does not depend on the interrogating officer personally publicizing the details, nor does it affect the implication that refusing to confess will result in a negative portrayal.

direct or implied promises, however slight[.]" (internal quotation marks omitted) (emphasis added)).  As such, this tactic of implying more favorable treatment if a confession is given is an improperly coercive interrogation technique, and its use by Det. Tokita during the interrogation weighs toward Baker's subsequent statement being involuntary.

The coercive nature of Det. Tokita's question about public perception was compounded by his subsequent question about how Baker's unwillingness to confess would be perceived in court.  Immediately after commenting on public perception, Det. Tokita asked Baker, "when you go to court, you think people want to hear somebody that's going to fucking deny, deny when the evidence is like insurmountable against them, but they're just going to deny, deny to the bitter end."  Det. Tokita implied that if Baker continued to deny his guilt in the face of the contrary evidence the jury would hold it against him.  The clear implication was that, if Baker confessed, the jury would not be as harsh because "they want to hear somebody that's you know what . . . I made a mistake, . . . that's not me, but I made a fucking mistake, I did and I'm sorry."[16]  Police statements of

---

[16]     The dissent appears to acknowledge the implication of Det. Tokita's comments about public perception and how a confession would be perceived in court but characterizes the comments as mere advice that it would be better for Baker to tell the truth.  Dissent at 31 (citing Kelekolio, 74 Haw. at 505, 849 P.2d at 70) ("Detective Tokita's line of questioning suggested to Baker that he would be able to salvage his reputation and improve his chances in court[.]").  Asserting that a jury

(continued . . .)

this nature imply to the accused that, by confessing, the accused will be better off because the jury will treat a repentant defendant with less severity than an unrepentant one. Through his implicit threats about how the jury would react to a defendant that continued to deny guilt, Det. Tokita effectively communicated to Baker that a confession would result in more favorable treatment. This tactic is of a type that is reasonably likely to procure an untrue statement or to influence an accused to make an involuntary confession. Kelekolio, 74 Haw. at 511-12, 849 P.2d at 73. Thus, Det. Tokita's use of this coercive tactic weighs in favor of Baker's confession not being voluntary.

Additionally, throughout the course of the interrogation, Det. Tokita described Baker's conduct in ways that minimized the egregiousness of the alleged crimes. Early in the interrogation, Det. Tokita stated, "I don't know if you was doing any other drugs, but I know you was drinking. I know you was smoking weed. . . . Everyone gets blasted on New Year's Eve and that's where I think everything went wrong because you just made an error in judgment." Det. Tokita followed up on

---

(. . . continued)

"want[s] to hear" a defendant confess to the charged crime is not mere advice to tell the truth; it is an assertion that the defendant will benefit from confessing. See Kelekolio, 74 Haw. at 505, 849 P.2d at 70 ("[M]ere advice from the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or promise does not render a subsequent confession involuntary." (emphasis added)).

this statement by saying that "Alcohol is . . . where people get themselves into trouble, cause they lose their inhibitions[.]" Shortly after, the detective told Baker, "I don't think you did it or meant to do it. You were just not in the right frame of mind. . . . That's where people go wrong, when they're in the wrong frame of mind." Then, Det. Tokita used gender stereotypes to normalize the alleged conduct by saying that "Women are a lot more promiscuous, you know. They flirt more, you know when they're on alcohol . . . cause they lose their inhibitions" and, shortly after, "Guys are programmed to procreate." After Det. Tokita told Baker that it was futile to continue denying that he had sex with the CW because there was physical evidence, Baker adopted Det. Tokita's minimized version of events and admitted that he had sex with the CW because he "was all fucked up." Then, after Baker admitted to having sex with the CW, Det. Tokita reinforced the narrative by stating, "when you on alcohol and you're on drugs, chances of that happening would be worse . . . you're not yourself." Finally, after Det. Tokita had repeatedly pushed Baker to admit to beating the CW and explain why he had done so, Baker relied on the minimized narrative again, stating, "I was drinking. It was in the moment. I was fucked off my ass."

When an interrogating officer suggests that the commission of the crime was understandable, justifiable, or

otherwise excusable, it implies to the accused that if a confession is given and the officer's version of events is adopted, the crime will be viewed less seriously and punishment will be more lenient.  Commonwealth v. DiGiambattista, 813 N.E.2d 516, 527 (Mass. 2004) (citing F.E. Inbau et al., Criminal Interrogation and Confessions 419-22 (4th ed. 2004)).  Often referred to as "minimization," the technique makes an implied promise that if the suspect adopts this minimized version of events, the crimes will be seen as less egregious. Rettenberger, 984 P.2d at 1018 ("[T]he interrogator communicates that the suspect will receive a reduced level of punishment . . . if he admits to a description of the offense the interrogator finds acceptable." (second alteration in original) (quoting Richard J. Ofshe & Richard A. Leo, The Decision to Confess Falsely: Rational Choice and Irrational Action, 74 Denv. U.L. Rev. 979, 999 (1997) [hereinafter The Decision to Confess Falsely]); see also Dassey v. Dittmann, 877 F.3d 297, 335 (7th Cir. 2017) (en banc) (Rovner, J., dissenting) ("Although a court must exclude a confession obtained by direct promise of leniency, the research demonstrates that minimization techniques are the functional equivalent in their impact on suspects." (citation omitted)).[17]

---

[17]     In response to the many authorities cited above, the dissent asserts that we are relying solely on DiGiambattista and Rettenberger to

(continued . . .)

In DiGiambattista, the Supreme Court of Massachusetts observed that the officers repeatedly portrayed the defendant's commission of arson as excusable because he was stressed, under the influence of alcohol, and had not intended to harm anyone. 813 N.E.2d at 526. The court found that the use of these minimization techniques alone would not render a confession involuntary, but the combination of false statements about irrefutable evidence and minimization techniques, as well as references to "counseling," rendered the defendant's statement involuntary. Id. at 528.

Similarly, in Rettenberger, the Supreme Court of Utah found that the use of minimization techniques during a custodial interrogation "strongly weighs against the conclusion that the confession was voluntary." 984 P.2d at 1018. There, the interrogating officers made several references to the defendant being charged with capital murder, but they suggested that the crime could be recast as a less serious offense if he were to confess. Id. The court observed that numerous times during the

_____

(. . . continued)

conclude that the minimization technique implies to the accused that adopting the minimized narrative will result in favorable treatment. Dissent at 34. The dissent proceeds to reject the notion that the minimization technique can make an implied promise. Dissent at 34. The implied promise that the minimization technique makes, however, is well documented and has been the subject of scholarly research for decades. See, e.g., Saul M. Kassin et al., Police Interrogations and Confessions: Communicating Promises and Threats by Pragmatic Implication, 15 L. & Hum. Behav. 233, 234-35 (1991); The Decision to Confess Falsely, supra, at 999; F.E. Inbau et al., supra, at 419-22.

interrogation, the officers suggested that the killing was unintentional and that the "officers could 'explain to the judge that this thing wasn't premeditated[.]'" Id. Similar to the court in DiGiambattista, the Rettenberger court found that minimization techniques alone may not be enough to render a confession involuntary but that at a minimum they are strong evidence that the defendant's confession was coerced. Id.

Here, Det. Tokita likewise repeatedly attempted to portray the commission of the alleged offense as understandable because of the drugs and alcohol that Baker and the CW had consumed and because of stereotypes associated with his gender and the gender of the CW. In doing so, Det. Tokita implicitly promised Baker that he would receive more favorable treatment if he adopted Det. Tokita's version of events and confessed. This tactic was reasonably likely to influence Baker to make an involuntary confession, particularly when combined with other coercive interrogation tactics. DiGiambattista, 813 N.E.2d at 528. Therefore, Det. Tokita's use of this tactic weighs in favor of Baker's confession being involuntary.

Moreover, Det. Tokita's use of gender stereotypes was improper not only because it implicitly promised Baker leniency in exchange for a confession, it was also manifestly inappropriate gender-based discrimination. By intimating that women are "more promiscuous . . . . when they're on alcohol

. . . cause they lose their inhibitions" and that "Guys are programmed to procreate," Det. Tokita appealed to improper prejudices about how men and women behave.  It is a fundamental duty of this court to call attention to those interrogation techniques that are "so offensive to a civilized system of justice that they must be condemned under principles of due process."  Kelekolio, 74 Haw. at 513-14, 849 P.2d at 74 (internal quotations omitted) (quoting Crane v. Kentucky, 476 U.S. 683, 687 (1986)).  Gender discrimination is expressly prohibited by our constitution and precedent of the United States Supreme Court.  State v. Levinson, 71 Haw. 492, 499, 795 P.2d 845, 849-50 (1990) (concluding that a defendant's use of peremptory challenges in a criminal case to discriminate against potential jurors on the basis of gender was prohibited by article I, section 5 of the Hawai'i Constitution); Weinberger v. Wiesenfeld, 420 U.S. 636, 637-39 (1975) (holding that the Social Security Act's disparate treatment of men and women on the basis of economic stereotypes violated due process).  Interrogation techniques that run afoul of our state's prohibitions on discrimination are so offensive that they must not be countenanced under principles of due process.[18]  See Kelekolio, 74 Haw. at 513-14, 849 P.2d at 74.

_____

[18]    The dissent agrees that Det. Tokita's statements were discriminatory on the basis of gender, but concludes that it was appropriate
(continued . . .)

36

Additionally, we have not hesitated to exclude statements or evidence from being used at trial when necessary to preserve the integrity of the judicial process. State v. Bowe, 77 Hawai'i 51, 59, 881 P.2d 538, 546 (1994) (holding that even in a situation when an accused is coerced into making a confession by a private individual, the state participates in that violation by allowing the coerced statements to be used as evidence); State v. Torres, 125 Hawai'i 382, 394, 262 P.3d 1006, 1018 (2011) ("[C]ourts should not place their imprimatur on evidence that was illegally obtained by allowing it to be admitted into evidence in a criminal prosecution."). Indeed, this court has resolutely condemned appeals to discriminatory prejudice used in various contexts. See, e.g., State v. Pitts, 146 Hawai'i 120, 137-38, 456 P.3d 484, 501-02 (2019) (stating that a court's inherent authority to administer justice would permit intervention if a peremptory challenge appeared to discriminate on a prohibited basis); State v. Rogan, 91 Hawai'i 405, 414, 984 P.2d 1231, 1240 (1999) (stating that appeals to prejudice "threaten[] our multicultural society and

(. . . continued)

for Det. Tokita to make these statements because he was "attempt[ing] to put Baker at ease." Dissent at 37. We do not consider Det. Tokita's purpose in making these statements to be relevant. It is deeply troubling that the dissent endorses the use of discriminatory rhetoric in custodial interrogations to put a suspect "at ease" in order to induce a confession. If adopted, the dissent's view would result in the tacit, indeed express, approval of discriminatory comments based on gender by a state actor during custodial interrogations, a position that we do not ascribe to.

constitutional values"); State v. David, 141 Hawai'i 315, 327, 409 P.3d 719, 731 (2017) (holding that the circuit court erred by failing to repudiate a prosecutor's improper appeal to race at sentencing).

In the context of discriminatory interrogation tactics, the appropriate action may be exclusion of a confession obtained by the use of such tactics. Matsumoto, 145 Hawai'i at 324, 452 P.3d at 321 ("The reasons for barring coerced admissions include . . . a desire that the police not become law breakers in the process of achieving society's valid law enforcement objectives." (internal quotation marks omitted)). Thus, in an effort to deter police interrogators from making discriminatory statements and to protect the integrity of the judicial system, we now hold that interrogation techniques that rely on stereotyping protected classes of persons are inherently coercive, and strongly weigh against any subsequent statement being voluntary.[19]   Here, Det. Tokita's use of discriminatory

_____

[19]   Although we hold that a police interrogator's use of a technique involving a discriminatory narrative is one factor to be examined under the totality of the circumstances, in extreme cases the discriminatory tactic may be so odious as to render any subsequent statement involuntary and inadmissible. Cf. Rogan, 91 Hawai'i at 411, 984 P.2d at 1237. Additionally, we clarify that our holding today applies without regard to the source of the legal protection from discrimination. Compare Haw. Const. art. I, § 5 (proscribing discrimination on the basis of race, religion, sex, or ancestry) with HRS § 378-2(a)(1) (Supp. 2019) (prohibiting employers from discriminating on the basis of race, sex including gender identity or expression, sexual orientation, age, religion, color, ancestry, disability, marital status, arrest and court record, reproductive health decision, or domestic or sexual violence victim status). Contrary to the dissent's
(continued . . .)

interrogation tactics strongly weighs toward finding Baker's statement involuntary.[20]

Det. Tokita also sought to demonstrate his trustworthiness by assuring Baker that he was not trying to deceive him. Early in the interrogation he told Baker, "I'm being straight with you cause you haven't had a record." Shortly thereafter, Det. Tokita assured Baker that he was not trying to manipulate Baker and was not "playing games." He told Baker that he was "being straight up" and that, reciprocally, Baker should be honest with him because "[f]air is fair." Soon after saying this, Det. Tokita drew connections between himself and Baker by stating that, like Baker, he does "some fucked up things when I drink, dude, let me tell you that." This statement was followed by Det. Tokita saying, "I do some fucked up things when I drink and that's part of the reason why, fuck,

(. . . continued)

assertions, we are not "polic[ing] the language" used by interrogating officers or "sanitizing" interrogations. Dissent at 36-37. We are simply refusing to place our imprimatur on the employment of discriminatory language during police interrogation and hold that its use, while weighing strongly against a finding of voluntariness, should be examined under the totality of the circumstances.

[20] The dissent characterizes our conclusion that the use of such discriminatory tactics weighs toward a finding of involuntariness as "bizarre." Dissent at 35. This conclusion is not surprising in light of the dissent's view that the police should be permitted to use discriminatory rhetoric during custodial interrogations so long as it is for a proper purpose, such as putting an accused "at ease." Dissent at 37; see supra note 18.

I'm divorced, you know what I mean?  Cause I did some fucked up things."

This attempt by Det. Tokita to build a rapport between himself and Baker during the interrogation is an example of the "false friend" interrogation technique.  See Rettenberger, 984 P.2d at 1016.  Officers use this technique to represent to the accused that they are friends who will act in the accused's best interest.[21]  2 Wayne R. LaFave et al., Criminal Procedure § 6.2(c) (4th ed.) ("Another type of deceit is the so-called 'false friend' technique, whereby the interrogator represents that he is a friend acting in the suspect's best interest.").  After establishing a rapport, "the suspect is fooled into trusting that the interrogator's behavior will conform to the norms of friendship: the interrogator will loyally help the suspect out of the jam, advise the suspect to confess only if confession will be beneficial, and so on."  Margaret L. Paris, Trust, Lies, and Interrogation, 3 Va. J. Soc. Pol'y & L. 3, 21-22 (1995).  Standing alone, this technique is typically not enough to render a confession involuntary, but its coercive effect may be exacerbated by its use in conjunction with other

---

[21]  The dissent rejects the notion that a police officer's attempts to build a false rapport with the accused during a custodial interrogation may be coercive and argues that the tactic is not recognized by our law. Dissent at 38.  In Spano v. New York, a case we cited in Kelekolio as an example of an extrinsic falsehood, the Supreme Court of the United States explicitly recognized the coercive nature of such deceptions.  Spano, 360 U.S. 315, 323-24 (1959); Kelekolio, 74 Haw. at 513, 849 P.2d at 74.

coercive interrogation tactics. Rettenberger, 984 P.2d at 1017 ("The significance of the [false friend] stratagem comes in relation to other tactics and factors.").

Here, Det. Tokita sought to earn Baker's trust by assuring Baker that he was being forthright and not "playing games." He implied that since he was "being straight up" with Baker, he was entitled to reciprocal treatment because "[f]air is fair." In doing so, Det. Tokita implied that there was a relationship of trust between himself and Baker, and that relationship created a mutual obligation of honesty. Additionally, the detective attempted to demonstrate empathy for Baker by suggesting that he also cannot control his behavior when intoxicated. To the extent that Baker believed Det. Tokita was not his adversary, he was less likely to question the veracity of Det. Tokita's statements, more likely to believe any promises or threats, and more likely to ultimately confess, regardless of guilt. Rettenberger, 984 P.2d at 1017. Because Det. Tokita used this tactic in conjunction with several other coercive interrogation techniques, we find that its use was reasonably likely to influence Baker to make an involuntary confession. Therefore, its use weighs toward Baker's confession being involuntary.

During the interrogation, Det. Tokita repeatedly encouraged Baker to confess to beating the CW, but Baker refused

41

to do so.  This culminated with Det. Tokita telling Baker "this is when I know you're not being straight with me.  You know what I mean <u>and when I write my report, that's what it's going to reflect</u>.  That you weren't being straight with me about that."  (Emphasis added.)  Baker, who had consistently denied beating the CW until this comment, asked Det. Tokita, "What do you want to hear, officer?  What question do you want to ask?"  When Det. Tokita again repeated the question "why did you beat her up?" Baker responded, "I was drinking.  It was in the moment.  I was fucked off my ass."

By informing an accused person that any untruthfulness will be recorded and reported to other persons or entities in the criminal justice system, the officer is making an implied threat that denying involvement in the crime will have adverse consequences.  The coercive nature of this tactic is exacerbated when, as here, it is deployed after repeated attempts to convince the accused to adopt the officer's version of events have failed.  While "mere advice" from the police that it would be better for the accused to tell the truth does not render a subsequent confession involuntary, an interrogating officer's exhortations to tell the truth accompanied by threats or promises are more likely to result in an accused's subsequent statement being involuntary.  <u>Kelekolio</u>, 74 Haw. at 505, 849 P.2d at 70.  Det. Tokita warned Baker that the report itself

would be detrimental to Baker if it showed that he continued to deny assaulting the CW.  The detective's statements were an implicit threat to Baker of adverse consequences if he continued in his denial, and Baker's response indicates his clear understanding of that warning.  Thus, Det. Tokita's reference to the report was reasonably likely to influence Baker to make an involuntary confession, and it also weighs in favor of Baker's statement being involuntary.[22]

### b. Deception About Incontrovertible Physical Evidence

In addition to the coercive tactics already discussed, Det. Tokita deliberately and repeatedly told Baker during the interrogation that DNA evidence tied Baker to the sexual assault of the CW.  As Officer Esaki testified at trial, however, none of the DNA evidence recovered could be connected to Baker.  By Det. Tokita's own admission, this was a lie designed to elicit Baker's confession.  Since the lie was in regard to the facts of the alleged offense, it was an intrinsic falsehood.  Matsumoto, 145 Hawai'i at 324, 452 P.3d at 321.  Under Kelekolio, this tactic would be treated like any other intrinsic factual

---

[22]    The dissent asserts that Det. Tokita "in no way" was implying that Baker would suffer adverse consequences for not confessing to the narrative when the detective told Baker: "You know what I mean and when I write my report, that's what it's going to reflect.  That you weren't being straight with me about that."  Dissent at 39 (emphasis added).  The obvious implication made by the reference to the report is confirmed by Baker's response, in which he replies to Det. Tokita, "What do you want to hear[?]" The dissent may fail to recognize the implication of Det. Tokita's reference to the report, but Baker did not.

deception. See Kelekolio, 74 Haw. At 513, 849 P.2d at 74. However, new developments have augmented our understanding of the inherently coercive nature of misrepresentations about incontrovertible physical evidence. See Corley v. United States, 556 U.S. 303, 321 (2009) (stating that there is mounting empirical evidence that the pressures inherent in custodial interrogations can induce a "frighteningly high percentage of people to confess to crimes they never committed") (citing Steven A. Drizin & Richard A. Leo, The Problem of False Confessions in the Post-DNA World, 82 N.C. L. Rev. 891, 906-07 (2004)). As such, we now consider how a court tasked with determining the voluntariness of an accused's statement should weigh an interrogating officer's use of intrinsic factual deception about incontrovertible physical evidence.

The presentation of falsified incontrovertible evidence is designed to demonstrate to the accused that they will inevitably be found guilty of the alleged crime. The Decision to Confess Falsely, supra, at 1013. The fact that the accused has failed to convince the interrogating officer of their innocence demonstrates that the accused will also be unable to convince a prosecutor, judge, or jury. Id. When confronted with false evidence such as DNA, which is uniquely identifying and therefore appears to be truly incontrovertible, the accused can come to believe that there is no alternative but

to confess.  Richard J. Ofshe & Richard A. Leo, The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions, 16 Stud. L. Pol. & Soc'y 189, 202-203 (1997).  This is especially true when the false evidence is characterized as scientific because people generally expect scientific tests to be accurate and trustworthy.  See Matsumoto, 145 Hawai'i at 326, 452 P.3d at 323; see also Miriam S. Gohara, A Lie for a Lie: False Confessions and the Case for Reconsidering the Legality of Deceptive Interrogation Techniques, 33 Fordham Urb. L.J. 791, 822 (2006) ("Suspects tend to believe that 'scientific' evidence--such as DNA, fingerprints, and even lie detector tests--are generally accepted by juries as infallible proof of guilt." (footnote omitted)).  What ultimately makes deception about incontrovertible evidence insidious is the implied threat that it carries: independent incriminating evidence exists, so the accused should confess in order to enter a mitigating statement into the record.  Gohara, supra, at 825-26.

Other courts in addressing the coercive nature of deceptions regarding incontrovertible physical evidence have found that fabricated physical evidence can render a suspect's confession invalid.  One such case is State v. Cayward, a case this court cited in Kelekolio as an example of when intrinsic factual deception may render a confession involuntary.  Cayward,

45

552 So.2d 971 (Fla. Dist. Ct. App. 1989); Kelekolio, 74 Haw. at 514 n.17, 849 P.2d at 74 n.17.  In Cayward, a Florida District Court of Appeal invalidated a confession obtained by police officers who presented the suspect with fabricated lab reports that purported to show that semen stains recovered from the victim's clothes matched the suspect's DNA.  552 So.2d at 974-75.  Similarly, in State v. Patton, the suspect's confession was deemed per se involuntary under the totality of the circumstances test because it was induced by a doctored audio tape.  826 A.2d 783, 784 (N.J. Super. Ct. App. Div. 2003).  The Supreme Court of Utah recognized the particularly coercive nature of false evidence "allegedly derived from scientific technologies" when it held that the police's repeated and egregious lies about the existence of physical evidence rendered a suspect's confession involuntary.  Rettenberger, 984 P.2d at 1015-16 (quoting The Decision to Confess Falsely, supra, at 1023) (holding a confession involuntary when, although no physical evidence existed against the defendant, the interrogating officers falsely told the defendant they had fingerprint matches, blood matches, recorded phone calls, and more).

In regard to coerciveness, there is no meaningful difference in the impact to an accused between a forgery, as used in Cayward and Patton, and oral misrepresentations as used

in Rettenberger and this case.[23] To the suspect, who does not expect the police to lie, there is no meaningful distinction between being given a piece of paper that purports to document guilt and an officer's confident assertion that scientific evidence incontrovertibly establishes the suspect's guilt.

Det. Tokita falsely told Baker several times that there was physical DNA evidence that would incriminate him. Prior to being told there was incontrovertible physical evidence implicating him, Baker refused to confess and repeatedly denied any wrongdoing. It was only after Det. Tokita asserted that physical evidence conclusively established that Baker had sex with the CW that he began to confess.[24] Each time Det. Tokita repeated his assertion that he had DNA evidence that would implicate Baker, Baker volunteered more information. Every

---

[23] The Cayward and Patton courts were particularly alarmed by the use of forgeries because of the "potential for mischief if the fabricated evidence found its way into the trial." Patton, 826 A.2d at 800.

[24] The Chief Justice's concurring and dissenting opinion distinguishes Det. Tokita's statements that "we g[o]t physical evidence, so you cannot deny that you didn't have sex with her" and "[w]e have physical evidence and nobody can deny physical evidence[,]" from the detective's statement, "[t]hat's why I know there's physical evidence that you guys cannot deny because there's DNA in there and you know that DNA's one of [a] kind," concluding that the former was not coercive because Det. Tokita did not specifically reference DNA. Recktenwald, C.J., Concurring and Dissenting (Concurrence/Dissent) at 6 n.2. However, an interrogating officer's false assertion that the accused's guilt is incontrovertibly established by physical evidence can be equally coercive to the accused without mentioning DNA. In this case, for example, Baker refused to admit any wrongdoing prior to the detective's false statement about undeniable physical evidence. See Rettenberger, 984 P.2d at 1015-16 (holding that an officer's misrepresentations that "they had unspecified 'physical evidence'" that linked defendant to the crime weighed toward defendant's confession being involuntary).

repetition of this assertion made the implied threat to Baker that his guilt was conclusively established by incriminating evidence. And correlatively, every reiteration made the implied promise that he could confess now, enter a mitigating statement into the record, and receive more favorable treatment.[25]

Det. Tokita's misrepresentations about physical DNA evidence implicate a matter intrinsic to the case and therefore are considered under the totality of the circumstances. Kelekolio, 74 Haw. at 511, 849 P.2d at 73. However, in light of the various studies and cases that have emerged since Kelekolio, we recognize that false claims of physical evidence result in an unsettling number of false or involuntary confessions.[26] Gohara,

---

[25]  Additionally, Det. Tokita previously told Baker that he was being honest with him because Baker did not have a criminal record as an adult. This likely aggravated the coercive effect of the detective's lies about incontrovertible physical evidence tying Baker to the crime.

[26]  The infamous case of the Central Park Five provides a salient example. One of the innocent boys who eventually confessed was told by a detective that his fingerprints would be found on the jogger's body, even though the detective knew this was not true. Gohara, supra, at 842 n.9. The boys were convicted in 1990, based almost entirely on their coerced confessions. However, in 2002 the Central Park Five's convictions were vacated after defense moved to vacate the judgment, with the prosecution submitting a 57 page affirmation detailing the flaws and errors in the investigation. People v. Wise, 752 N.Y.S.2d 837 (N.Y. Sup. Ct. 2002).
    The dissent distinguishes the Central Park Five case from this one because there is corroborating evidence of Baker's culpability. Dissent at 37 n.5. The United State Supreme Court has rejected an approach that considers the existence of corroborating evidence in determining whether a confession was induced by impermissible methods:

>  Indeed, in many of the cases in which the command of the Due Process Clause has compelled us to reverse state convictions involving the use of confessions obtained by impermissible methods, independent corroborating evidence left little doubt of the truth of what the defendant had confessed. Despite such verification, confessions were

(continued . . .)

supra, at 826 ("An innocent person and a guilty person alike are likely to see the 'evidence' for what it appears to be--a threat of dire consequences awaiting them regardless of whether they confess. . . . [B]y any rational calculation, a confession may ameliorate the otherwise inevitable and unhappy consequences awaiting the suspect, whether he is guilty or innocent."); Drizin & Leo, supra, 906-07. Thus, we reaffirm our holding in Kelekolio that intrinsic factual deception is analyzed under the totality of the circumstances, but we clarify that misrepresentations about the existence of incontrovertible physical evidence that directly implicates the accused is an exceptionally coercive interrogation tactic and its use is a strong indicator that the suspect's statement was involuntary.[27]

---

(. . . continued)

> found to be the product of constitutionally impermissible methods in their inducement. <u>Since a defendant had been subjected to pressures to which, under our accusatorial system, an accused should not be subjected, we were constrained to find that the procedures leading to his conviction had failed to afford him that due process of law which the Fourteenth Amendment guarantees.</u>

Rogers v. Richmond, 365 U.S. 534, 541 (1961) (emphasis added); see also Aleman v. Vill. of Hanover Park, 662 F.3d 897, 906 (7th Cir. 2011) ("The question of coercion is separate from that of reliability. A coerced confession is inadmissible . . . even if amply and convincingly corroborated." (citing Rogers, 365 U.S. at 540-41)).

[27] The dissent emphasizes the intrinsic nature of Det. Tokita's deception "regarding the existence of incriminating evidence" and appears to conclude that that prevents it from being coercive. Dissent at 41. This is inconsistent with our law, which provides that intrinsic factual deception is coercive unless it is not of a type that would reasonably induce a false or involuntary confession. Kelekolio, 74 Haw. at 513, 849 P.2d at 74 ("[W]e emphasize that we are not purporting to enunciate a bright line per se rule
(continued . . .)

In certain cases, lies about incontrovertible physical evidence may, standing alone, render the accused's subsequent confession involuntary.  See Kelekolio, 74 Haw. at 514 n.17, 849 P.2d at 74 n.17 (citing Cayward, 552 So. 2d at 972-74); Patton, 826 A.2d at 784.  Accordingly, Det. Tokita's lies to Baker about the existence of incontrovertible physical evidence implicating him in the attack on the CW strongly weigh toward Baker's statement being involuntary.

The dissent maintains that Det. Tokita was constitutionally permitted to use some of the impermissible tactics that were employed to elicit Baker's confession because they had not been explicitly condemned by this court at the time of the interrogation in this case.  Dissent at 28.  In essence, the dissent argues that a tactic's coerciveness is related to this court's recognition of it, which is plainly incorrect.  Interrogation tactics may render a confession involuntary if they are coercive; a tactic does not become coercive only after it has already been "prohibited by the courts or the Legislature

---

(. . . continued)

that the use of intrinsic factual deception cannot, given the totality of circumstances surrounding any given statement, result in an involuntary confession.").  The Kelekolio court in fact recognized that deception as to scientific evidence is eminently likely to induce a false or involuntary confession, even when the deception concerns intrinsic facts.  Id. at 513-14, 514 n.17, 849 P.2d at 74, 74 n.17 (citing Cayward as an example for when an intrinsic factual deception renders a confession involuntary under the totality of the circumstances).

of this State." Dissent at 28. The implication of the dissent's contention is that coercive tactics previously not condemned by this court are shielded from review. This is not an approach that we have ever taken. Indeed, this court recently vacated a defendant's conviction after we unanimously held that an interrogating officer's falsehood about polygraph results was extrinsic and per se coercive, despite the fact that our determination was not announced prior to the defendant's interrogation.[28] Matsumoto, 145 Hawai'i at 325-27, 452 P.3d at 322-24.

c. **Consideration of the Totality of the Circumstances**

In determining the ultimate issue of voluntariness, the individual circumstances relevant to the voluntariness of

---

[28]     The dissent states that we rely on "a law review article" to support our conclusions as to the coerciveness of Det. Tokita's interrogation tactics. Dissent at 38. This disregards the numerous scholarly authorities cited in this opinion. This court has consistently considered new developments in social science when deciding critical issues such as the one presented here. See, e.g., State v. Cabagbag, 127 Hawai'i 302, 310, 277 P.3d 1027, 1035 (2012) (stating that the "robust body of research" that had developed in the area of eye witness identifications supported requiring the circuit courts to give a specific jury instruction upon the request of the defendant regarding the trustworthiness of an eyewitness identification if such identification is central to the case); State v. Kaneaiakala, 145 Hawai'i 231, 242, 450 P.3d 761, 772 (2019) (stating that a "robust body of scholarship and empirical research has emerged calling into doubt" whether certain factors previously adopted by the court were "sufficient indicators of reliability and admissibility").

Allowing our understanding of the factual nature of coercion to be dictated by outmoded and disproven theories of human psychology, particularly in the face of robust scholarship and empirical research, would be an abdication of our constitutional duty to uphold a defendant's right against self-incrimination. See Matsumoto, 145 Hawai'i at 327, 452 P.3d at 324 ("Extensive scientific literature and numerous documented cases have demonstrated the coercive nature of falsified polygraph test results[.]").

the accused's statement must be considered in their totality. Kelekolio, 74 Haw. at 502, 849 P.2d at 69; Wilson, 260 F.3d at 953. During the course of the interrogation, Det. Tokita employed seven separate improperly coercive interrogation techniques. They were as follows: (1) the comments suggesting the public and media would perceive Baker more favorably if he confessed; (2) the implication that Baker would be perceived less favorably in court if he continued to deny guilt; (3) the minimization narratives suggesting the conduct was understandable because of the drugs and alcohol involved; (4) the use of unlawfully discriminatory gender-based stereotypes to excuse or explain conduct; (5) the use of the false friend technique; (6) the insinuation that Baker's refusal to admit to assaulting the CW would be set forth in the detective's report and could adversely affect him; and (7) the detective's false assertion that there was incontrovertible DNA evidence showing that Baker had sex with the CW, which, as the detective testified at trial, was told to Baker to "try[] to get the truth out of him."

An interrogator's use of multiple coercive interrogation tactics in conjunction can exacerbate the coercive effect of the individual tactics. See DiGiambattista, 813 N.E.2d at 528 (explaining that the coercive effect of an assertion about irrefutable evidence of guilt is worsened when

it is combined with minimization tactics); Rettenberger, 984 P.2d at 1017 ("The significance of the [false friend technique] comes in relation to other tactics and factors."). All of the tactics used here, except for the improper gender stereotyping, made an implied promise to Baker that he would benefit if he confessed and suffer adverse consequences if he did not. The use of these tactics in conjunction with one another exacerbated their overall coercive effect on Baker because they ultimately presented the same implicit promise of gaining a benefit by confessing--and receiving a detriment by not admitting guilt.[29]

The dissent maintains that the surrounding circumstances of the interview weigh in favor of voluntariness

---

[29] The dissent suggests that our analysis requires that any comment alluding to "positive outcomes for the defendant" is an implied promise of a benefit from confessing, and it concludes that each tactic Det. Tokita used was permissible under Kelekolio's holding that "mere advice from the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or promise does not render a subsequent confession involuntary." Dissent at 32; Kelekolio, 74 Haw. at 505, 849 P.2d at 70 (brackets omitted). Manifestly, the detective's insinuations were not "mere advice" that it would be better for Baker to tell the truth; the detective repeatedly demanded that Baker confess to committing the crime in a specific manner, which he supplied through a minimized narrative of the incident. When Baker failed to conform his confession to the detective's narrative, the detective intimidatingly informed Baker that such deviation would be reflected in his report, prompting Baker to ask the detective "What do you want to hear, officer? What question do you want to ask?" (Emphasis added.) Additionally, this court held in Kelekolio that exhortations to tell the truth are only appropriate if they are "unaccompanied by either a threat or promise." Kelekolio, 74 Haw. at 505, 849 P.2d at 70 (emphasis added). Here, as discussed above, Det. Tokita's tactics implied to Baker that he would benefit from confessing and suffer consequences if he did not. It is incorrect to suggest that the interrogation consisted solely of "mere advice" that it would be better to tell the truth unaccompanied by either a threat or promise. With the sole exception of Det. Tokita's discriminatory comments, each of the impermissible tactics Det. Tokita employed was accompanied by implicit threats or promises, which is prohibited under Kelekolio. Id.

and accordingly concludes that Baker's confession was not coerced. Dissent at 42-44. The dissent first points to the fact that Baker was informed of his constitutional rights and waived them. However, the question of whether an accused's decision to give a statement was a free and unconstrained choice is distinct from whether Miranda warnings were given and knowingly and intelligently waived. Miranda warnings do not immunize statements obtained during custodial interrogations from being the product of coercion. See, e.g., Bowe, 77 Hawai'i at 53, 881 P.2d at 540 (holding that defendant's confession was involuntary although defendant had been "given Miranda warnings and subsequently signed an HPD Form 81, waiving his constitutional rights").[30]

The dissent also contends that Baker's confession was voluntary because Det. Tokita "never raised his voice or vocalized aggressively." Dissent at 26 (quoting Kelekolio, 74 Haw. at 489, 849 P.2d at 64). But psychological coercion does

---

[30] The dissent cites to Dassey v. Dittmann, 877 F.3d 297 (7th Cir. 2017) (en banc), for the proposition that an accused's adoption of a proffered narrative weighs towards a confession being involuntary if the accused completely subsumes their will to that of the interrogating officer and adopts any proffered narrative in its entirety. Dissent at 43. To that point, the dissent inaccurately asserts that we rely on Baker "entirely" adopting Det. Tokita's narrative. Dissent at 43. It is also incorrect that a confession can only be involuntary if the accused completely subsumes their will to that of the interrogating officer and adopts any proffered narrative in its entirety. Yong Shik Won, 137 Hawai'i at 340, 372 P.3d at 1075 ("Voluntariness means a 'free and unconstrained choice.'"). The fact that Baker did not adopt every specific fact that Det. Tokita presented to him does not demonstrate that his confession was voluntarily given.

not require an aggressive tone of voice.  See Matsumoto, 145 Hawai'i at 326, 452 P.3d at 323 ("[F]alse polygraph results may psychologically prime an innocent suspect to make a confession."); State v. Kazanas, 138 Hawai'i 23, 26, 375 P.3d 1261, 1264 (2016) ("[C]oercion can be mental as well as physical[.]" (first alteration in original) (quoting Miranda v. Arizona, 384 U.S. 436, 448 (1966)).  Additionally, the dissent asserts that Baker was a "mature individual."  Dissent at 27 (quoting Frazier, 394 U.S. at 739).  Baker had only an eighth-grade education, and his level of maturity clearly did not safeguard him from the detective's psychologically coercive techniques.  See Clewis v. Texas, 386 U.S. 707, 712 (1967) (finding that the defendant's low educational attainment weighed toward his confession being involuntary).  The dissent concludes that Baker answered all of Det. Tokita's questions "with ease" and there is "no evidence" that the detective coerced Baker's confession in any way.  Dissent at 27, 43.  In fact, the circuit court ruled that Baker's statements during the final portion of his interrogation were involuntarily made because of Det. Tokita's interrogation techniques, and the concurring and dissenting opinion concludes that an additional, separate portion of Baker's confession was also not voluntarily obtained.  Concurrence/Dissent at 7.

Ultimately, the nature and extent of the coercive interrogation tactics in this case strongly indicate that Baker's statement was involuntary. As extensively discussed, Det. Tokita utilized multiple coercive tactics in conjunction to overbear Baker's will, and it is clear that Baker's statements did not result from a free and unconstrained decision to make a confession. Bowe, 77 Hawai'i at 59, 881 P.2d at 546 (stating that the "right to make a meaningful choice between confessing and remaining silent" is "implicit in a fundamentally fair trial").

Accordingly, under the totality of the circumstances, we conclude that Baker's confession was not voluntarily obtained.[31] Det. Tokita's use of multiple coercive interrogation tactics and their use in conjunction rendered Baker's confession involuntary.[32] Therefore, the admission of the statement at

---

[31] The circuit court suppressed the final portion of the interrogation "wherein the detective sought to get the defendant to admit that he directed his brother to hit and assault the complaining witness, which the brother did not want to do." We do not see an impactful difference between the coerciveness of Det. Tokita's tactics in the final portion of the interrogation and the rest of the interrogation. Throughout the interrogation, as discussed, Det. Tokita employed impermissibly coercive techniques. The dissent apparently disagrees with the circuit court's determination that a significant portion of Baker's confession was involuntary. Dissent at 4 ("It is clear to me from the audio recording of Baker's confession that Detective Tokita did not coerce Baker's confession and that it was voluntarily given.").

[32] Baker did not contend that any of the coercive tactics used by Det. Tokita were per se coercive extrinsic falsehoods and thus we do not address the voluntariness of his statement under that rubric. However, it is noted that many of the tactics used, such as the comments about public perception, perception in court, and the detective's report, implicate facts extrinsic to the alleged offense and may be extrinsic falsehoods under Kelekolio.

trial violated Baker's right against self-incrimination under article I, section 10 of the Hawai'i Constitution.  Matsumoto, 145 Hawai'i at 324, 452 P.3d at 321 (citing Kelekolio, 74 Haw. at 502, 849 P.2d at 69).  We note, however, that our decision does not rest solely on Det. Tokita's use of multiple coercive tactics.  Although the use of multiple coercive tactics in conjunction rendered Baker's statement involuntary, a single coercive interrogation technique may render a confession involuntary.  See Kelekolio, 74 Haw. at 511, 514 n.17, 849 P.2d at 73, 74 n.17 (citing Cayward as an example of when an intrinsic falsehood would render a confession involuntary); Patton, 826 A.2d at 784; cf. Matsumoto, 145 Hawai'i at 325-27, 452 P.3d at 322-24 (holding that an officer's extrinsic falsehood about polygraph results was per se coercive and rendered the defendant's confession involuntary).

**B. Harmless Error**

Once it has been determined that a confession was erroneously admitted into evidence, the appellate court must consider whether the erroneous admission was harmless beyond a reasonable doubt.  Matsumoto, 145 Hawai'i at 327, 452 P.3d at 324.  The erroneous admission of evidence is not harmless when there is a reasonable possibility that the error might have contributed to the conviction.  State v. McCrory, 104 Hawai'i

203, 210, 87 P.3d 275, 282 (2004). If such a reasonable possibility exists, then the error is not harmless beyond a reasonable doubt and the judgment of conviction on which it may have been based must be set aside. Id. (quoting State v. Gano, 92 Hawai'i 161, 176, 988 P.2d 1153, 1168 (1999)). When a conviction is largely dependent on a jury's determination as to the credibility of the complainant's testimony, the erroneous admission of evidence that contributes to the credibility of that testimony is not harmless error. See State v. Underwood, 142 Hawai'i 317, 329, 418 P.3d 658, 670 (2018) (finding that prosecutor's improper statements were not harmless beyond a reasonable doubt when conviction depended on credibility of complaining witness).

In this case, Baker's statement to Det. Tokita strongly bolstered the evidence adduced by the State at trial that Baker was the perpetrator of the crime. The State's evidence as to identity was predicated on the credibility of the CW's testimony, particularly because of the lack of physical evidence that Baker had committed the alleged crime. Additionally, Baker's statement to Det. Tokita was contrary to the exculpatory evidence adduced by the defense and undermined its credibility. Accordingly, the admission of Baker's statement was not harmless error. Kazanas, 138 Hawai'i at 41, 375 P.3d at 1279 (holding that when the case turns on the

58

credibility of trial witnesses, the improper admission of a statement which harmed credibility was not harmless beyond a reasonable doubt).

Based on the foregoing, the circuit court erred in determining that Baker's confession was voluntarily given, and the ICA erred in affirming the circuit court's ruling.[33]

## V. CONCLUSION

We are cognizant of the very serious injuries that were suffered by the CW in this case and the egregious circumstances of the offenses. This court has recognized, however, that "the more heinous the crime, the more care must be exercised by the presiding judge to see that defendant's rights are protected." State v. Uyesugi, 100 Hawai'i 442, 462, 60 P.3d 843, 863 (2002) (quoting Territory v. Hays, 43 Haw. 58 (Haw. Terr. 1958)); see also Christopher J. v. Ames, 828 S.E.2d 884, 894 (W. Va. 2019) ("[T]he horrific acts . . . committed against the victims in this case cannot prevent this Court from carrying

---

[33] Our determination that Baker's confession was involuntary renders it unnecessary to address Baker's contention that the circuit court abused its discretion in redacting from his confession that he was "raped as a kid." It is also unnecessary to resolve Baker's arguments regarding consecutive sentencing and Apprendi considerations. However, we note that at sentencing the circuit court considered the fact that Baker had "taken no responsibility at any time" when deciding to impose consecutive sentences. In relying on Baker's unwillingness to take responsibility for the crime, the court violated the well-established rule that a sentencing court may not consider a defendant's refusal to admit guilt in imposing sentence. State v. Barnes, 145 Hawai'i 213, 219, 450 P.3d 743, 749 (2019); State v. Kamana'o, 103 Hawai'i 315, 316, 82 P.3d 401, 402 (2003).

out its duty to apply the law equally to all litigants."). Thus, our application of the law cannot turn on the nature and circumstances of the charged crime, and the commitment to this principle is crucial to a defendant's right to due process. Uyesugi, 100 Hawai'i at 462, 60 P.3d at 863. The Supreme Court of the United States articulated this obligation many decades ago and explained that upholding a conviction that follows the admission into evidence of an involuntary confession is impermissible, even if the confession is likely to be true, because the methods used to obtain it offend the underlying principles of our criminal justice system.

> [C]onvictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.

Rogers v. Richmond, 365 U.S. 534, 540–41 (1961) (emphases added).

We also recognize that interrogations play an important role in our criminal justice system. But police interrogations must be conducted in conformance with societal standards, and our society has been long-committed to the principle that criminal proceedings should be accusatorial rather than inquisitorial. The dissent disagrees with the

60

outcome of this case and suggests that our holding will render "police officers wholly unable to question suspects." Dissent at 33. This is simply not the case. "Nothing we have said today affects the powers of the police to investigate 'an unsolved crime[]' by gathering information from witnesses and by other 'proper investigative efforts.'" State v. Kitashiro, 48 Haw. 204, 214, 397 P.2d 558, 564 (1964) (citations omitted) (quoting Escobedo v. Illinois, 378 U.S. 478, 492 (1964)). Our holding requires only that "when the process shifts from investigatory to accusatory--when its focus is on the accused and its purpose is to elicit a confession," the interrogating officers may not use coercive interrogation techniques to induce a confession. Id. Our decision is an application of a principle to which we are constitutionally committed, that confessions should be freely and voluntarily given and must not be the product of coercion. State v. Yong Shik Won, 137 Hawai'i 330, 340, 372 P.3d 1065, 1075 (2015) ("Voluntariness means a 'free and unconstrained choice.'" (quoting State v. Shon, 47 Haw. 158, 166, 385 P.2d 830, 836 (1963))); see also State v. Bowe, 77 Hawai'i 51, 57, 881 P.2d 538, 544 (1994) ("An involuntary confession is inherently untrustworthy because the free will of an individual is overborne by the external influence exerted in obtaining it.").

Accordingly, the ICA's February 2, 2018 Judgment on Appeal and the circuit court's January 29, 2016 judgment are vacated, and this case is remanded to the circuit court for further proceedings consistent with this opinion.

| | |
|---|---|
| Dwight C.H. Lum<br>for petitioner | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| Sonja P. McCullen<br>for respondent | /s/ Michael D. Wilson |

